NUMBER 13-08-364-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


VALENTIN GAONA, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 214th District Court 

of Nueces County, Texas.

 


MEMORANDUM OPINION


Before Justices Rodriguez, Garza, and Vela


Memorandum Opinion by Justice Vela




 Appellant, Valentin Gaona, and a codefendant, Ricardo Cavazos, (1) were indicted for
the capital murder of Alfino Garcia. See Tex. Penal Code Ann. § 19.03(a)(2) (Vernon
Supp. 2008). The jury found appellant guilty, and the State having not sought the death
penalty, the trial court sentenced appellant to life imprisonment. See id. § 12.31(a)
(Vernon Supp. 2008). By one issue, appellant challenges the factual sufficiency of the
evidence to support his conviction. We affirm. 

I. Factual Background


 Oralia Cavazos and her boyfriend, Ruben Gonzalez, lived at 130 Green Trail Drive
in Corpus Christi, Texas. In the early morning of August 24, 1999, a fire started in the
home. Officer Edward Longoria arrived at the scene about 1:58 a.m. and saw Cavazos
outside the house, crying and with blood on her left shoulder. Firefighters found the body
of Alfino Garcia in the living room. The medical examiner testified the cause of Garcia's
death was "smoke inhalation" and that the manner of his death was "homicide."

 On cross-examination, when defense counsel asked Officer Longoria, "So based
upon the knowledge that you had back then, even before any determination was made
whether it was, I don't know, an accidental fire or anything, it got relayed to you that it was
an arson?", he replied, "I think after responding to the call and the information that I got and
without reading the report, in a nutshell it seemed like there was a disturbance with the
suspect and Cavazos." (2)

A. Firefighters' Testimony

 Assistant Fire Chief John Page and Captain Lee Rogers responded to the fire in
separate vehicles. While en route to the fire, both saw a man walking away from the fire. 
Page testified that "when we were initially dispatched, part of what the dispatcher said
giving the address was that the caller had stated that the suspect was leaving the scene." 
While traveling on Bear Lane en route to the fire, the only person Page saw was a stocky
Hispanic man whom he described as "somewhere between probably five eight and six foot,
200, 220 pounds, walking down the street opposite my direction of travel." Page stated the
man was wearing a white or light-colored T-shirt with "something on the front of the shirt
that was different than the shirt," which "[c]ould have been" a stain of some kind but not a
patch. The man was not looking at Page, and Page felt this was "kind of odd because
usually people look at vehicles with lights and sirens on." Page was traveling "probably"
sixty miles per hour when he saw this man at "1:00 something in the morning." On cross-examination, he testified that he saw the man for a "split second" and that the man did not
appear to be injured. 

 Captain Rogers testified that he was a member of Rescue 3, which is located on
Morgan Avenue. While en route to the fire, the vehicle he was riding in drove from Morgan
Avenue to Old Brownsville Road to Bear Lane and then to Green Trail Drive. When his
vehicle turned right onto Bear Lane from Old Brownsville Road, he saw a man wearing "a
dark-colored T-shirt" walking on Bear Lane towards Old Brownsville Road. What caught
Rogers' eye was that the man "seemed to be trying very hard to avoid seeing us or looking
at us, and that's very unusual" because "[w]hen a fire apparatus goes by, normally people
stop and look. And this particular individual was very near the roadway, but it was like he
was really keeping his glare fixed to like not make eye contact at all. And that's a very
strange situation." He further stated that "that night," "smoke [was] . . . in the air". Normally
that doesn't cause people or bystanders or onlookers to leave. It causes them to want to
go look. And when a fire apparatus drives by, just like everybody else, they always look. 
And . . . it's very strange when somebody deliberately tries not to look." He saw the man
between 2:00 a.m. and 3:00 a.m. and described him as being of "medium height,
somewhat heavyset, dark haired, didn't appear to be clean shaven," and "ruddy
complected."

 When Captain Rogers arrived at the scene, he saw a male and female in the front
yard. They indicated that someone was in the house. Captain Rogers and his partner
entered the home and took Garcia out of the house. After the fire was put out, Captain
Rogers saw "a broken window in a bedroom in the rear" of the house.

 On cross-examination, he testified that his vehicle was going between twenty to
twenty-five miles per hour when it turned onto Bear Lane. When counsel asked him, "And
how far up the street was he [the man] after you made the corner?", he replied, "Probably
a quarter of the block." "He didn't have very long before he was going to get to Old
Brownsville Road."

B. The Investigation

 Lieutenant Kelly Isaacks, the chief investigator in this case, testified that while
witnesses were being interviewed about this incident, she received information regarding
a vehicle that had been seen and that it "may be related to the individual . . . that we were
looking at in reference to having information about this fire." The evening following the fire,
she found the vehicle, a brown Oldsmobile, license plate number HMZ-20W, parked at
3517 Colonial Street in Corpus Christi. She said the vehicle was registered to appellant. 
That same evening, Lt. Isaacks met with appellant, who was in Robstown, Texas. She
noticed he "had a laceration to his forehead that was still bleeding" and that he "had a
laceration to his right forearm that . . . looked pretty fresh." Appellant was taken to the
Corpus Christi Police Department where he gave Lt. Isaacks his written statement in which
he stated:


 Yesterday, on 08-23-99, at about 4 p.m., I saw my ex-girlfriend, Oralia
Cavazos, over on Elgin St. at her ex-boyfriend's house. I called her over at
his house and we decided to meet at 4:45 p.m. at the James Corner Store. 
I drove over to the store and met Oralia there. She had the kids with her. 
The store was closed so I followed her over to the H.E.B. at Ayers/Port. 
Oralia and I sat in the car drinking beer and talking. The kids got off the car
and waited for us at the store. Then, the kids came back. We went into [the]
store and bought some food and a 12-pack of beer. We went over to the
house on Elgin St. and Oralia dropped off the groceries and she got the
laundry. I followed Oralia to the Laundromat from there. We sat in the car
listening to the radio while the clothes were washing. We talked about me
and her missing each other and possible [sic] getting back together. She told
me about the house that she had got. She told me where it was . I told her
I knew already but I really didn't. We drank some more beer. We were at
the Laundromat about an hour. I left the Laundromat. I got on the freeway
and Oralia was following me. Then, I followed her. She drove to her sister's
house on 16th St. to drop off her niece but no one was home. After that, she
told me that we would see each other later. She told me she would call me. 
I took off cruising and she went her way. I drove around waiting. Then, I
went to her brother Rudy's house off Highland St. I asked about where
Oralia was and he told me she would be back soon from the store. Oralia
came back from the store and gave me a beer. We talked for awhile about
being together that night. We talked about getting a motel room. Then, she
said she had talked to Ruben and she would ask him to leave so we could
get back together that night. Oralia left me at her brother's house. Later that
night, I drove over to Oralia's house and saw her car there. I rang the
doorbell and knocked at the door. My daughters came to the door. About
that time, a tall, young guy came up and he was asking around for Ricky. 
Ricky is Oralia's nephew. I talked to Oralia and asked her if she was ready
to leave. She kept telling me to wait just a minute and she never would
come. I waited and opened the door. I asked if Ruben wouldn't let her go
or what. She told me to wait and be quiet. I walked a couple of feet inside
the door and then walked out. Oralia closed the door on me. I told her "fuck
this" and hit the front window and broke it. I got in my car and left. I took off
and got on the freeway at Agnes St. and Oralia slammed into the back of my
car with her car. I pulled over and so did she and we talked a little more. I
told her to call me whenever she was ready and she said okay. I don't
remember anything else until I woke up about 3 a.m. I was parked on Old
Robstown Road. I tried to start the car and it wouldn't start so I walked to
Linda Delacruz's house on Colonial. I went inside, that's when she told me
my head was messed up and my arm. I don't know how that happened. The
next morning, she helped me push it to her house. I was wearing a black t-shirt and gray pants on this night. This statement is true and correct to the
best of my knowledge.




 Lt. Isaacks testified that appellant "couldn't remember" what occurred during the
period of time the fire took place.

 On cross-examination, Lt. Isaacks testified appellant turned himself in in Robstown,
but she did not know how he got to Robstown when his car was found in Corpus Christi. 
When counsel asked her, "So you don't know who was driving the car that night?", she
replied, "Well, by his own admission he told me he was." She testified that in her opinion,
appellant's head injury was not caused when Oralia Cavazos hit the back of appellant's car
with her car. She stated, "There was no damage to the vehicle like that at all where he
[appellant] would have struck it on the windshield or anything like that." She stated
"[T]here's no doubt in my mind that this fire was intentionally set." When counsel asked
her, "Did anybody identify [appellant] as being the person that they saw during the time that
this fire was set in the neighborhood?", she replied, "I have descriptions from individuals
who saw a subject matching his description with an injury like he had leaving the scene of
that fire just right after it was reported." She said that no witness "got a good look at [the
suspect's] face" and that the descriptions varied when it came to the suspect's height and
weight. However, she said, "[T]he descriptions were all a husky Hispanic male. Some
gave a description of a bandage on his arm. . . . [T]he descriptions were all very similar
in nature . . . when you're talking about 3:00 o'clock in the morning, 2:00 o'clock in the
morning." At the time of appellant's arrest on August 24, 1999, he was five foot three
inches tall and weighed 250 pounds.

 On the night of the fire, Curtis Melde was working as a security guard at the Del Mar
College west campus. While on bike patrol at 1:05 a.m., he saw an unoccupied brown
Oldsmobile, license number HMZ-20W, parked in the administration parking lot, which is
on the front side of the campus facing Old Brownsville Road and Airport Road. Melde had
been by there previously and did not see this car parked there. He was concerned
because it was parked there "after hours." At approximately 2:35 a.m., "a heavyset
Hispanic male" got into the car and left on Airport Road. The evidence showed this car
was registered to appellant.

 On cross-examination, counsel questioned Melde about the time frame as follows:

 Q. So between 11:00 and 1:00 you didn't see a vehicle there?


 A. Usually my patrols take 30 minutes for the complete campus. So I
would say anywhere from--


 Q. 12:35 to 1:05?


 A. Yeah. Anywhere around there.


 During the guilt-innocence phase, the trial court admitted State's exhibit 44, a map
showing the relationship between the location of the fire and Del Mar College west
campus. The map shows that in order to get to Del Mar College west campus from the
location of the fire, a person could go from Green Trail Drive to Green Park and then from
Green Park to Bear Lane and then from Bear Lane to Old Brownsville Road. The legend
on the map would allow the jury to approximate the distance from the fire to the college via
this route. 

C. The Forensic Evidence

 After the fire was extinguished, investigators found blood in a rear bedroom of the
Cavazos home. The blood was found on the floor and on a window sill. Appellant's known
DNA profile matched the DNA taken from the blood found in the rear bedroom.

 Marcia Parker, a latent-print examiner, found a palm print on the widow sill of the
rear bedroom of the Cavazos home. She said the palm print was "visible to the naked eye"
and located on the inside of the window. She identified the print as appellant's left palm
print. 

D. The Investigation Into The Cause Of The Fire

 1. Findings By The State Fire Marshal's Office

 Tommy Pleasant, an investigator and senior canine handler, used his dog, Hyco,
to search the Cavazos home for trace amounts of ignitable liquids. He testified that Hyco,
who was trained to alert on fourteen different ignitable liquids, "gave me four alerts and
indications throughout the residence." Hyco's first alert was on the living-room floor, and
the other three alerts were in the enclosed garage area. Pleasant collected one sample
from each area where Hyco alerted. The lab analysis showed that these samples were
negative for accelerants. However, Pleasant offered three possible explanations for why
the samples were negative: (1) he could have collected "a bad sample"; (2) after he
collected the sample, "it could have evaporated before analysis"; and (3) Hyco could have
detected something that he could not take a sample of. He stated that "our dogs are
trained to find hydrocarbons that are in ignitable liquids" and that "[s]cientists have proven
that the dogs can smell parts per million, parts per billion. They have a very sensitive nose
. . . ."

 Dean Shirley, a chief arson investigator, began his investigation between 8:00 a.m.
and 8:30 a.m. on the morning of the fire. He testified the fire started in the northwest
bedroom, which was the converted garage. He concluded "that there was an ignitable
liquid that was poured on the floor of that bedroom and then ignited, using some type of
open flame." He said that "my conclusion was that the television [in the bedroom where
the fire started] was a result of the fire that was from the ignitable liquid on the floor and not
a contributing factor to the ignition of the fire." He stated "that an electrical engineer could
not determine that that television caused the fire." He did not find either a match or a
lighter at the scene, but said that its "pretty rare that we find the ignition components, if it
was a match or a lighter. Many times if there is something there, it's been consumed" or
"[t]hey're taken with the person who may have used it." Three days after the fire, Shirley
returned to the Cavazos home and collected a sample from the floor of the bedroom where
the fire started. Shirley disagreed (3) with the assessment of a non-testifying investigator,
who believed that the television set caused the fire.

 In 1999, analysts with the State Fire Marshal's arson laboratory tested the samples
collected by Pleasant and Shirley from the Cavazos home. Sondra Budge, an analyst with
the State Fire Marshall's arson laboratory, tested the samples which Pleasant collected
and stated that they were negative for ignitable liquid residue. However, she stated there
are "a number of reasons" for failing to detect any ignitable liquids: (1) "the fire
suppression activities [could have] washed it away"; (2) "[i]t could have been burned up";
(3) "[i]t also could have evaporated before it was collected"; and (4) "there were [no
accelerants] to begin with." She testified that the absence of accelerants does not
necessarily exclude the possibility of arson.

 With respect to the sample collected by Shirley, Budge testified that the result of this
test "was called a no standard, which means that we could not exclude the possibility that
perhaps an ignitable liquid residue was present but we didn't have any reference standards
to compare it to for a positive identification" and that "it contains the components that could
make it an accelerant; but, again, we didn't have any particular reference that we could
compare it to. So we did not positively identify it." Several years later, Budge compared
this sample to an updated list of reference samples and found "a reference that it matched
to in 2008" and that "[w]e would identify that particular reference as what's called a
naphthenic paraffinic." She testified that in 1999, the naphthenic paraffinics were not part
of their reference samples. She said that this substance is used as a solvent and is found
in lamp oils and some charcoal starters. She said that this substance can be used as an
accelerant.

 2. Findings By The Corpus Christi Fire Department


 Peter Salazar, a firefighter and investigator, investigated the fire at the Cavazos
home and found "heavy fire damage" to the converted garage and believed that the fire
started there "[i]n the vicinity of the bed." He testified that in most cases, accelerants
indicated an intentional fire and that the burn pattern on the floor was consistent with the
use of accelerants.

 On cross-examination, Salazar could not say exactly what started the fire, and he
could not "totally" rule out the possibility that a cigarette started the fire. However, he
determined the fire was an arson fire based upon his observations at the scene. He
acknowledged receiving a report, dated August 30, 1999, from the Texas Department of
Insurance, (4) stating that "No common commercially available flammable or combustible
ignitable liquids were chromatographically detected[.]" However, when counsel asked him,
"So if they didn't find anything, you can't say that accelerants were used, can you?", he
replied, "You still can, sir." Salazar stated that "when you do use accelerants, there's
always the possibility that they all got burned up in the fire and they're not going to have
any residue left." He stated there are other ways to determine whether an accelerant was
used to start a fire, "not just the fact that the results came back negative." He said, "You
can tell by the way the floor is burned, the patterns on the floor, if they poured any kind of
ignitable liquids on the floor. The floor . . . tiles will burn different than the rest of the room." 
When counsel asked him, "[W]as this determined?", he replied, "Yes, sir." When counsel
asked him, "Was the tile in the bedroom shown to be an accelerant there, or was it
someplace else in the house that you recall?", he replied, "In the bedroom." Salazar
testified that firefighters used "quite a bit" of water to put out the fire and that this could
have washed away a lot of evidence that was in the bedroom.

 Appellant rested his case without calling any witnesses.

II. Discussion


 In his sole issue, appellant argues the evidence is factually insufficient to support
his conviction. An appellate court must begin a factual sufficiency review with the
assumption that the evidence is legally sufficient under Jackson v. Virginia, 443 U.S. 307
(1979). Laster v. State, No. PD-1276-07, 2009 WL 80226 at *2 (Tex. Crim. App. Jan. 14,
2009) (citing Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (citing Clewis
v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996)). However, evidence that is legally
sufficient can be deemed factually insufficient in two ways: (1) "the evidence supporting
the conviction is 'too weak' to support the factfinder's verdict"; or (2) "considering conflicting
evidence, the factfinder's verdict is 'against the great weight and preponderance of the
evidence.'" Id. (quoting Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). 
When a court of appeals conducts a factual sufficiency review, the court must defer to the
jury's findings. Id. (citing Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997)). The
court of criminal appeals has "set out three 'basic ground rules' implementing this
standard." Id. (quoting Watson, 204 S.W.3d at 414). First, the appellate court must
consider all of the evidence in a neutral light, (5) as opposed to in a light most favorable to
the verdict. Id. (citing Watson, 204 S.W.3d at 414). Second, the appellate court "may only
find the evidence factually insufficient when necessary to 'prevent manifest injustice.'" Id.
(quoting Cain, 958 S.W.2d at 407). Although the verdict is afforded less deference during
a factual sufficiency review, an appellate court is not free to "override the verdict simply
because it disagrees with it." Id. (citing Cain, 958 S.W.2d at 407). Third, the appellate
court must explain why the evidence is too weak to support the verdict or why the
conflicting evidence greatly weighs against the verdict. Id. (citing Watson, 204 S.W.3d at
414).

 "In reviewing the sufficiency of the evidence, we should look at 'events occurring
before, during and after the commission of the offense and may rely on actions of the
defendant which show an understanding and common design to do the prohibited act.'" 
Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (citing Cordova v. State, 698
S.W.2d 107, 111 (Tex. Crim. App. 1985); Thompson v. State, 697 S.W.2d 413, 416 (Tex.
Crim. App. 1985)). "Each fact need not point directly and independently to the guilt of the
appellant, as long as the cumulative effect of all the incriminating facts are [sic] sufficient
to support the conviction." Id. (citing Alexander v. State, 740 S.W.2d 749, 758 (Tex. Crim.
App. 1987)).


A. Capital Murder

 The indictment charged that appellant "intentionally cause[d] the death of an
individual, namely, ALFINO GARCIA, BY SETTING FIRE TO THE HOUSE OCCUPIED BY
ALFINO GARCIA while in the course of committing or attempting to commit arson, . . . ." 
The penal code provides that a person commits capital murder "if the person commits
murder as defined under Section 19.02(b)(1) and: . . . (2) the person intentionally commits
the murder in the course of committing or attempting to commit . . . arson . . . ." Tex. Penal
Code Ann. § 19.03(a)(2) (Vernon Supp. 2008). Murder is defined as "intentionally or
knowingly caus[ing] the death of an individual." Id. § 19.02(b)(1). Intent may "be inferred
from the circumstantial evidence such as acts, words, and the conduct of the appellant." 
Guevara, 152 S.W.3d at 50 (citing Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App.
1995)).

 Under Texas law, arson is committed when:

 (a) A person . . . starts a fire, regardless of whether the fire continues after
ignition, or causes an explosion with intent to destroy or damage:


 . . . . 


 (2) any building, habitation, or vehicle;


 (A) knowing that it is within the limits of an incorporated city or
town;


 . . . [or] . . . 


 (F) when the person is reckless about whether the burning or
explosion will endanger the life of some individual or the safety
of the property of another.


Tex. Penal Code Ann. § 28.02(a)(2) (A) and (F) (Vernon Supp. 2008).



B. Analysis

 The State presented evidence showing appellant's intent to cause an individual's
death as follows: On the night of the fire, appellant was angry at his ex-girlfriend, Oralia
Cavazos, because she told him she had talked to Ruben Gonzalez and that she would ask
him to leave so she and appellant could get back together that night. When appellant
arrived at Cavazos's home, she told appellant to wait, and when he opened the door, she
closed it on him. In response, appellant broke the front window of Cavazos's home. 
Appellant drove away, and Cavazos "slammed into the back of [appellant's] car with her
car." This evidence established a motive for appellant to murder Cavazos. See Guevara,
152 S.W.3d at 50 ("Motive is a significant circumstance indicating guilt.") (citing Harris v.
State, 727 S.W.2d 537, 542 (Tex. Crim. App. 1987)); see also Reed v. State, 744 S.W.2d
112, 127 (Tex. Crim. App. 1988) (providing that evidence which merely goes to show
motive or opportunity of the accused to commit the crime may be considered in connection
with other evidence tending to connect the accused with the crime). 

 The evidence regarding arson showed that a sample which Shirley collected from
inside the Cavazos home contained a naphthenic paraffinic, which can be used as an
accelerant. Furthermore, burn patterns on the enclosed garage's floor showed the fire
started in that room. Pleasant's dog, Hyco, searched the Cavazos home for trace amounts
of ignitable liquids and alerted once on the living room floor and three times in the enclosed
garage. Shirley concluded "that the fire originated on the floor" in the converted garage,
and "that there was an ignitable liquid that was poured on the floor of that bedroom and
then ignited, using some type of open flame." Salazar determined the fire was an arson
fire based upon his observations at the scene. The evidence showed that the fire caused
Garcia's death based upon the fact that firefighters found his body in the living room and
that his autopsy results showed he died from smoke inhalation.

 The evidence that connected appellant to the arson fire was that Captain Rogers,
while en route to the fire, saw a man wearing "a dark-colored T-shirt" walking away from
the fire on Bear Lane towards Old Brownsville Road. He testified this man "seemed to be
trying very hard to avoid seeing us or looking at us," which is "very unusual." In appellant's
written statement to Lt. Isaacks, appellant said nothing about a fire, but he stated he "was
wearing a black t-shirt."

 Melde testified that on the night of the fire, he saw a brown Oldsmobile, license plate
HMZ-20W, parked at the Del Mar College west campus located on Old Brownsville Road
and Airport Road. The car was there between 12:35 a.m. and 1:05 a.m., based on his
thirty-minute patrols of the campus. At approximately 2:35 a.m., he saw a heavy set
Hispanic male get in the car and drive off. The evidence showed the car was registered
to appellant and that appellant was heavy set and is Hispanic. When Lt. Isaacks spoke to
appellant the evening following the fire, appellant could not remember what happened
during the time period before and after the fire occurred. Appellant stated in his written
statement that "I don't remember anything else until I woke up about 3 a.m. . . . ." Lt.
Isaacks received descriptions from individuals who saw a subject matching appellant's
description with an injury like appellant had leaving the scene of the fire "right after it was
reported." When she talked to appellant on the evening following the fire, he had a
bleeding laceration to his forehead and a "pretty fresh" laceration to his right forearm. Lt.
Isaacks opined that appellant's head injury was not caused when Cavazos hit the back of
his car with her car.

 Shortly after the fire, blood samples were taken from both the floor and window sill
of a rear bedroom in the Cavazos house. Appellant's DNA profile matched the DNA profile
from these blood samples. Appellant's palm print was found in the rear bedroom of the
Cavazos home. In his written statement to Lt. Isaacks, appellant stated, "She [Cavazos]
told me about the house that she had got. She told me where it was. I told her I knew
already but I really didn't." (emphasis added). Because appellant stated that he did not
know until the night of the fire where Cavazos's house was located, the jury could have
concluded that his blood and palm print had to be left there the night of the fire. His blood
and palm print connect him to the house. See Hinojosa v. State, 4 S.W.3d 240, 246 (Tex.
Crim. App. 1999) (holding, in factual sufficiency review, shoe prints discovered at the
victim's house connect appellant to that location).

 Based upon this evidence, a rational jury could find that appellant parked his car at
the Del Mar College west campus sometime between 12:35 a.m. and 1:05 a.m., went to
the Cavazos home, entered the home through the rear bedroom where he left his blood
on the window sill and the floor, set fire to the house, and then went back to his car and
drove away at approximately 2:35 a.m.

 The contrary evidence showed that: (1) no one saw who started the fire in the
Cavazos home; (2) no one identified appellant as the person leaving the scene of the fire;
(3) Pete Salazar could not say exactly what caused the fire; (4) neither assistant fire chief
John Page nor Captain Lee Rogers identified appellant as the man they saw walking away
from the fire's location; (5) Melde did not identify appellant as the man he saw getting into
the brown Oldsmobile; (6) in his written statement, appellant mentioned nothing about his
involvement in any fire; (7) appellant did not flee; rather, he met with Lt. Isaacks in
Robstown and in Corpus Christi; (8) the victim's autopsy showed he had cocaine and
marihuana in his body; and (9) no accelerants were found in appellant's car or on his
clothes.

 The jury has the responsibility to fairly resolve conflicts in the evidence, to weigh the
evidence, and to draw reasonable inferences from the evidence. Threadgill v. State, 146
S.W.3d 654, 663 (Tex. Crim. App. 2004). Considering the totality of the evidence-motive,
the DNA evidence, the palm-print evidence, the evidence showing the fire was caused by
arson, appellant's failure to account for the time periods before and after the fire, that,
based upon when Officer Longoria arrived at the fire, the fire was reported at least by 1:58
a.m., the fact that appellant's car was parked at Old Brownsville Road and Airport Road
between approximately 12:35 a.m. and 2:35 a.m. on the night of the fire, that a heavyset
Hispanic man drove away in this car, that appellant is a heavyset Hispanic man, and that
Old Brownsville Road is a road which a person could access when either going to or
coming from Green Trail Drive--we hold that, when viewed neutrally, the evidence
supporting the conviction is not too weak to support the verdict. See Laster at *2. Further,
considering the conflicting evidence, the verdict is not so against the great weight and
preponderance of the evidence that it is manifestly unjust. See Laster at *2.

 We therefore conclude that the evidence is factually sufficient to support the
conviction for capital murder. The fact that a different person than Cavazos died as a
result of appellant's conduct is immaterial to whether appellant is criminally responsible for
Garcia's death. See Tex. Penal Code Ann. § 6.04(b) (Vernon 2003). (6)





III. Conclusion


 We overrule the sole issue for review and affirm the trial court's judgment. 

 

 ROSE VELA 

 Justice



Do not publish.

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and

filed this 26th day of March, 2009.
1. After the State rested its case at the guilt-innocence phase, the trial court granted a directed verdict
of not guilty in favor of Ricardo Cavazos.
2. Neither Cavazos nor Gonzalez testified in this case.
3. On direct-examination, the prosecutor asked Shirley as follows:


 Q. Let me go back to the fire. Did you disagree or agree with Mr. Padilla's assessment
of the television and whether it started the fire or not?


 A. I disagreed with Mr. Padilla's assessment.


 Q. Based on everything you saw, do you have any doubt that the fire started at the bed
and not the television?


 A. I have the opinion that the fire started on the floor involving ignitable liquids around
the bed and around those items that were on the floor, too.
4. Sondra Budge, an analyst with the State Fire Marshal's arson laboratory, testified that the State Fire
Marshal's office is part of the Texas Department of Insurance. 
5. Laster v. State, No. PD-1276-07, 2009 WL 80226 at *2 (Tex. Crim. App. Jan. 14, 2009) (citing
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006)).
6. Section 6.04(b) of the penal code provides: "A person is nevertheless criminally responsible for
causing a result if the only difference between what actually occurred and what he desired, contemplated, or
risked is that: (1) a different offense was committed; or (2) a different person or property was injured, harmed,
or otherwise affected." Tex. Penal Code Ann. § 6.04(b) (Vernon 2003).