

# NUMBER 13-08-364-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**VALENTIN GAONA,**                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                **Appellee.**

---

### On appeal from the 214th District Court
### of Nueces County, Texas.

---

## MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Vela**
**Memorandum Opinion by Justice Vela**

Appellant, Valentin Gaona, and a codefendant, Ricardo Cavazos,[1] were indicted for

the capital murder of Alfino Garcia.  *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon

---

[1]After the State rested its case at the guilt-innocence phase, the trial court granted a directed verdict
of not guilty in favor of Ricardo Cavazos.

Supp. 2008). The jury found appellant guilty, and the State having not sought the death penalty, the trial court sentenced appellant to life imprisonment. *See id.* § 12.31(a) (Vernon Supp. 2008). By one issue, appellant challenges the factual sufficiency of the evidence to support his conviction. We affirm.

## I. Factual Background

Oralia Cavazos and her boyfriend, Ruben Gonzalez, lived at 130 Green Trail Drive in Corpus Christi, Texas. In the early morning of August 24, 1999, a fire started in the home. Officer Edward Longoria arrived at the scene about 1:58 a.m. and saw Cavazos outside the house, crying and with blood on her left shoulder. Firefighters found the body of Alfino Garcia in the living room. The medical examiner testified the cause of Garcia's death was "smoke inhalation" and that the manner of his death was "homicide."

On cross-examination, when defense counsel asked Officer Longoria, "So based upon the knowledge that you had back then, even before any determination was made whether it was, I don't know, an accidental fire or anything, it got relayed to you that it was an arson?", he replied, "I think after responding to the call and the information that I got and without reading the report, in a nutshell it seemed like there was a disturbance with the suspect and Cavazos."[2]

A. *Firefighters' Testimony*

Assistant Fire Chief John Page and Captain Lee Rogers responded to the fire in separate vehicles. While en route to the fire, both saw a man walking away from the fire. Page testified that "when we were initially dispatched, part of what the dispatcher said giving the address was that the caller had stated that the suspect was leaving the scene."

---

[2]Neither Cavazos nor Gonzalez testified in this case.

2

While traveling on Bear Lane en route to the fire, the only person Page saw was a stocky Hispanic man whom he described as "somewhere between probably five eight and six foot, 200, 220 pounds, walking down the street opposite my direction of travel." Page stated the man was wearing a white or light-colored T-shirt with "something on the front of the shirt that was different than the shirt," which "[c]ould have been" a stain of some kind but not a patch. The man was not looking at Page, and Page felt this was "kind of odd because usually people look at vehicles with lights and sirens on." Page was traveling "probably" sixty miles per hour when he saw this man at "1:00 something in the morning." On cross-examination, he testified that he saw the man for a "split second" and that the man did not appear to be injured.

Captain Rogers testified that he was a member of Rescue 3, which is located on Morgan Avenue. While en route to the fire, the vehicle he was riding in drove from Morgan Avenue to Old Brownsville Road to Bear Lane and then to Green Trail Drive. When his vehicle turned right onto Bear Lane from Old Brownsville Road, he saw a man wearing "a dark-colored T-shirt" walking on Bear Lane towards Old Brownsville Road. What caught Rogers' eye was that the man "seemed to be trying very hard to avoid seeing us or looking at us, and that's very unusual" because "[w]hen a fire apparatus goes by, normally people stop and look. And this particular individual was very near the roadway, but it was like he was really keeping his glare fixed to like not make eye contact at all. And that's a very strange situation." He further stated that "that night," "smoke [was] . . . in the air". Normally that doesn't cause people or bystanders or onlookers to leave. It causes them to want to go look. And when a fire apparatus drives by, just like everybody else, they always look. And . . . it's very strange when somebody deliberately tries not to look." He saw the man between 2:00 a.m. and 3:00 a.m. and described him as being of "medium height,

3

somewhat heavyset, dark haired, didn't appear to be clean shaven," and "ruddy complected."

When Captain Rogers arrived at the scene, he saw a male and female in the front yard. They indicated that someone was in the house. Captain Rogers and his partner entered the home and took Garcia out of the house. After the fire was put out, Captain Rogers saw "a broken window in a bedroom in the rear" of the house.

On cross-examination, he testified that his vehicle was going between twenty to twenty-five miles per hour when it turned onto Bear Lane. When counsel asked him, "And how far up the street was he [the man] after you made the corner?", he replied, "Probably a quarter of the block." "He didn't have very long before he was going to get to Old Brownsville Road."

B. *The Investigation*

Lieutenant Kelly Isaacks, the chief investigator in this case, testified that while witnesses were being interviewed about this incident, she received information regarding a vehicle that had been seen and that it "may be related to the individual . . . that we were looking at in reference to having information about this fire." The evening following the fire, she found the vehicle, a brown Oldsmobile, license plate number HMZ-20W, parked at 3517 Colonial Street in Corpus Christi. She said the vehicle was registered to appellant. That same evening, Lt. Isaacks met with appellant, who was in Robstown, Texas. She noticed he "had a laceration to his forehead that was still bleeding" and that he "had a laceration to his right forearm that . . . looked pretty fresh." Appellant was taken to the Corpus Christi Police Department where he gave Lt. Isaacks his written statement in which he stated:

4

Yesterday, on 08-23-99, at about 4 p.m., I saw my ex-girlfriend, Oralia Cavazos, over on Elgin St. at her ex-boyfriend's house. I called her over at his house and we decided to meet at 4:45 p.m. at the James Corner Store. I drove over to the store and met Oralia there. She had the kids with her. The store was closed so I followed her over to the H.E.B. at Ayers/Port. Oralia and I sat in the car drinking beer and talking. The kids got off the car and waited for us at the store. Then, the kids came back. We went into [the] store and bought some food and a 12-pack of beer. We went over to the house on Elgin St. and Oralia dropped off the groceries and she got the laundry. I followed Oralia to the Laundromat from there. We sat in the car listening to the radio while the clothes were washing. We talked about me and her missing each other and possible [sic] getting back together. She told me about the house that she had got. She told me where it was . I told her I knew already but I really didn't. We drank some more beer. We were at the Laundromat about an hour. I left the Laundromat. I got on the freeway and Oralia was following me. Then, I followed her. She drove to her sister's house on 16th St. to drop off her niece but no one was home. After that, she told me that we would see each other later. She told me she would call me. I took off cruising and she went her way. I drove around waiting. Then, I went to her brother Rudy's house off Highland St. I asked about where Oralia was and he told me she would be back soon from the store. Oralia came back from the store and gave me a beer. We talked for awhile about being together that night. We talked about getting a motel room. Then, she said she had talked to Ruben and she would ask him to leave so we could get back together that night. Oralia left me at her brother's house. Later that night, I drove over to Oralia's house and saw her car there. I rang the doorbell and knocked at the door. My daughters came to the door. About that time, a tall, young guy came up and he was asking around for Ricky. Ricky is Oralia's nephew. I talked to Oralia and asked her if she was ready to leave. She kept telling me to wait just a minute and she never would come. I waited and opened the door. I asked if Ruben wouldn't let her go or what. She told me to wait and be quiet. I walked a couple of feet inside the door and then walked out. Oralia closed the door on me. I told her "fuck this" and hit the front window and broke it. I got in my car and left. I took off and got on the freeway at Agnes St. and Oralia slammed into the back of my car with her car. I pulled over and so did she and we talked a little more. I told her to call me whenever she was ready and she said okay. I don't remember anything else until I woke up about 3 a.m. I was parked on Old Robstown Road. I tried to start the car and it wouldn't start so I walked to Linda Delacruz's house on Colonial. I went inside, that's when she told me my head was messed up and my arm. I don't know how that happened. The next morning, she helped me push it to her house. I was wearing a black t-shirt and gray pants on this night. This statement is true and correct to the best of my knowledge.

Lt. Isaacks testified that appellant "couldn't remember" what occurred during the period of time the fire took place.

On cross-examination, Lt. Isaacks testified appellant turned himself in in Robstown, but she did not know how he got to Robstown when his car was found in Corpus Christi. When counsel asked her, "So you don't know who was driving the car that night?", she replied, "Well, by his own admission he told me he was." She testified that in her opinion, appellant's head injury was not caused when Oralia Cavazos hit the back of appellant's car with her car. She stated, "There was no damage to the vehicle like that at all where he [appellant] would have struck it on the windshield or anything like that." She stated "[T]here's no doubt in my mind that this fire was intentionally set." When counsel asked her, "Did anybody identify [appellant] as being the person that they saw during the time that this fire was set in the neighborhood?", she replied, "I have descriptions from individuals who saw a subject matching his description with an injury like he had leaving the scene of that fire just right after it was reported." She said that no witness "got a good look at [the suspect's] face" and that the descriptions varied when it came to the suspect's height and weight. However, she said, "[T]he descriptions were all a husky Hispanic male. Some gave a description of a bandage on his arm. . . . [T]he descriptions were all very similar in nature . . . when you're talking about 3:00 o'clock in the morning, 2:00 o'clock in the morning." At the time of appellant's arrest on August 24, 1999, he was five foot three inches tall and weighed 250 pounds.

On the night of the fire, Curtis Melde was working as a security guard at the Del Mar College west campus. While on bike patrol at 1:05 a.m., he saw an unoccupied brown Oldsmobile, license number HMZ-20W, parked in the administration parking lot, which is on the front side of the campus facing Old Brownsville Road and Airport Road. Melde had

6

been by there previously and did not see this car parked there. He was concerned because it was parked there "after hours." At approximately 2:35 a.m., "a heavyset Hispanic male" got into the car and left on Airport Road. The evidence showed this car was registered to appellant.

On cross-examination, counsel questioned Melde about the time frame as follows:

Q. So between 11:00 and 1:00 you didn't see a vehicle there?

A. Usually my patrols take 30 minutes for the complete campus. So I would say anywhere from—

Q. 12:35 to 1:05?

A. Yeah. Anywhere around there.

During the guilt-innocence phase, the trial court admitted State's exhibit 44, a map showing the relationship between the location of the fire and Del Mar College west campus. The map shows that in order to get to Del Mar College west campus from the location of the fire, a person could go from Green Trail Drive to Green Park and then from Green Park to Bear Lane and then from Bear Lane to Old Brownsville Road. The legend on the map would allow the jury to approximate the distance from the fire to the college via this route.

C. *The Forensic Evidence*

After the fire was extinguished, investigators found blood in a rear bedroom of the Cavazos home. The blood was found on the floor and on a window sill. Appellant's known DNA profile matched the DNA taken from the blood found in the rear bedroom.

Marcia Parker, a latent-print examiner, found a palm print on the widow sill of the rear bedroom of the Cavazos home. She said the palm print was "visible to the naked eye" and located on the inside of the window. She identified the print as appellant's left palm

7

print.

D. *The Investigation Into The Cause Of The Fire*

    1. *Findings By The State Fire Marshal's Office*

Tommy Pleasant, an investigator and senior canine handler, used his dog, Hyco, to search the Cavazos home for trace amounts of ignitable liquids. He testified that Hyco, who was trained to alert on fourteen different ignitable liquids, "gave me four alerts and indications throughout the residence." Hyco's first alert was on the living-room floor, and the other three alerts were in the enclosed garage area. Pleasant collected one sample from each area where Hyco alerted. The lab analysis showed that these samples were negative for accelerants. However, Pleasant offered three possible explanations for why the samples were negative: (1) he could have collected "a bad sample"; (2) after he collected the sample, "it could have evaporated before analysis"; and (3) Hyco could have detected something that he could not take a sample of. He stated that "our dogs are trained to find hydrocarbons that are in ignitable liquids" and that "[s]cientists have proven that the dogs can smell parts per million, parts per billion. They have a very sensitive nose . . . ."

Dean Shirley, a chief arson investigator, began his investigation between 8:00 a.m. and 8:30 a.m. on the morning of the fire. He testified the fire started in the northwest bedroom, which was the converted garage. He concluded "that there was an ignitable liquid that was poured on the floor of that bedroom and then ignited, using some type of open flame." He said that "my conclusion was that the television [in the bedroom where the fire started] was a result of the fire that was from the ignitable liquid on the floor and not a contributing factor to the ignition of the fire." He stated "that an electrical engineer could not determine that that television caused the fire." He did not find either a match or a

8

lighter at the scene, but said that its "pretty rare that we find the ignition components, if it was a match or a lighter. Many times if there is something there, it's been consumed" or "[t]hey're taken with the person who may have used it." Three days after the fire, Shirley returned to the Cavazos home and collected a sample from the floor of the bedroom where the fire started. Shirley disagreed[3] with the assessment of a non-testifying investigator, who believed that the television set caused the fire.

In 1999, analysts with the State Fire Marshal's arson laboratory tested the samples collected by Pleasant and Shirley from the Cavazos home. Sondra Budge, an analyst with the State Fire Marshall's arson laboratory, tested the samples which Pleasant collected and stated that they were negative for ignitable liquid residue. However, she stated there are "a number of reasons" for failing to detect any ignitable liquids: (1) "the fire suppression activities [could have] washed it away"; (2) "[i]t could have been burned up"; (3) "[i]t also could have evaporated before it was collected"; and (4) "there were [no accelerants] to begin with." She testified that the absence of accelerants does not necessarily exclude the possibility of arson.

With respect to the sample collected by Shirley, Budge testified that the result of this test "was called a no standard, which means that we could not exclude the possibility that perhaps an ignitable liquid residue was present but we didn't have any reference standards

_____

[3]On direct-examination, the prosecutor asked Shirley as follows:

Q.      Let me go back to the fire. Did you disagree or agree with Mr. Padilla's assessment of the television and whether it started the fire or not?

A.      I disagreed with Mr. Padilla's assessment.

Q.      Based on everything you saw, do you have any doubt that the fire started at the bed and not the television?

A.      I have the opinion that the fire started on the floor involving ignitable liquids around the bed and around those items that were on the floor, too.

9

to compare it to for a positive identification" and that "it contains the components that could make it an accelerant; but, again, we didn't have any particular reference that we could compare it to. So we did not positively identify it." Several years later, Budge compared this sample to an updated list of reference samples and found "a reference that it matched to in 2008" and that "[w]e would identify that particular reference as what's called a naphthenic paraffinic." She testified that in 1999, the naphthenic paraffinics were not part of their reference samples. She said that this substance is used as a solvent and is found in lamp oils and some charcoal starters. She said that this substance can be used as an accelerant.

2. *Findings By The Corpus Christi Fire Department*

Peter Salazar, a firefighter and investigator, investigated the fire at the Cavazos home and found "heavy fire damage" to the converted garage and believed that the fire started there "[i]n the vicinity of the bed." He testified that in most cases, accelerants indicated an intentional fire and that the burn pattern on the floor was consistent with the use of accelerants.

On cross-examination, Salazar could not say exactly what started the fire, and he could not "totally" rule out the possibility that a cigarette started the fire. However, he determined the fire was an arson fire based upon his observations at the scene. He acknowledged receiving a report, dated August 30, 1999, from the Texas Department of Insurance,[4] stating that "No common commercially available flammable or combustible ignitable liquids were chromatographically detected[.]" However, when counsel asked him, "So if they didn't find anything, you can't say that accelerants were used, can you?", he

---

[4]Sondra Budge, an analyst with the State Fire Marshal's arson laboratory, testified that the State Fire Marshal's office is part of the Texas Department of Insurance.

10

replied, "You still can, sir." Salazar stated that "when you do use accelerants, there's always the possibility that they all got burned up in the fire and they're not going to have any residue left." He stated there are other ways to determine whether an accelerant was used to start a fire, "not just the fact that the results came back negative." He said, "You can tell by the way the floor is burned, the patterns on the floor, if they poured any kind of ignitable liquids on the floor. The floor . . . tiles will burn different than the rest of the room." When counsel asked him, "[W]as this determined?", he replied, "Yes, sir." When counsel asked him, "Was the tile in the bedroom shown to be an accelerant there, or was it someplace else in the house that you recall?", he replied, "In the bedroom." Salazar testified that firefighters used "quite a bit" of water to put out the fire and that this could have washed away a lot of evidence that was in the bedroom.

Appellant rested his case without calling any witnesses.

## II. Discussion

In his sole issue, appellant argues the evidence is factually insufficient to support his conviction. An appellate court must begin a factual sufficiency review with the assumption that the evidence is legally sufficient under *Jackson v. Virginia*, 443 U.S. 307 (1979). *Laster v. State*, No. PD-1276-07, 2009 WL 80226 at *2 (Tex. Crim. App. Jan. 14, 2009) (citing *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (citing *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996)). However, evidence that is legally sufficient can be deemed factually insufficient in two ways: (1) "the evidence supporting the conviction is 'too weak' to support the factfinder's verdict"; or (2) "considering conflicting evidence, the factfinder's verdict is 'against the great weight and preponderance of the evidence.'" *Id*. (quoting *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). When a court of appeals conducts a factual sufficiency review, the court must defer to the

jury's findings. *Id*. (citing *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997)). The court of criminal appeals has "set out three 'basic ground rules' implementing this standard." *Id*. (quoting *Watson*, 204 S.W.3d at 414). First, the appellate court must consider all of the evidence in a neutral light,[5] as opposed to in a light most favorable to the verdict. *Id*. (citing *Watson*, 204 S.W.3d at 414). Second, the appellate court "may only find the evidence factually insufficient when necessary to 'prevent manifest injustice.'" *Id*. (quoting *Cain*, 958 S.W.2d at 407). Although the verdict is afforded less deference during a factual sufficiency review, an appellate court is not free to "override the verdict simply because it disagrees with it." *Id*. (citing *Cain*, 958 S.W.2d at 407). Third, the appellate court must explain why the evidence is too weak to support the verdict or why the conflicting evidence greatly weighs against the verdict. *Id*. (citing *Watson*, 204 S.W.3d at 414).

"In reviewing the sufficiency of the evidence, we should look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (citing *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985); *Thompson v. State*, 697 S.W.2d 413, 416 (Tex. Crim. App. 1985)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are [sic] sufficient to support the conviction." *Id*. (citing *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987)).

---

[5]*Laster v. State*, No. PD-1276-07, 2009 WL 80226 at *2 (Tex. Crim. App. Jan. 14, 2009) (citing *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006)).

12

A. *Capital Murder*

The indictment charged that appellant "intentionally cause[d] the death of an individual, namely, ALFINO GARCIA, BY SETTING FIRE TO THE HOUSE OCCUPIED BY ALFINO GARCIA while in the course of committing or attempting to commit arson, . . . ." The penal code provides that a person commits capital murder "if the person commits murder as defined under Section 19.02(b)(1) and: . . . (2) the person intentionally commits the murder in the course of committing or attempting to commit . . . arson . . . ." TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 2008). Murder is defined as "intentionally or knowingly caus[ing] the death of an individual." *Id*. § 19.02(b)(1). Intent may "be inferred from the circumstantial evidence such as acts, words, and the conduct of the appellant." *Guevara*, 152 S.W.3d at 50 (citing *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995)).

Under Texas law, arson is committed when:

(a) A person . . . starts a fire, regardless of whether the fire continues after ignition, or causes an explosion with intent to destroy or damage:

. . . .

(2) any building, habitation, or vehicle;

(A) knowing that it is within the limits of an incorporated city or town;

. . . [or] . . .

(F) when the person is reckless about whether the burning or explosion will endanger the life of some individual or the safety of the property of another.

TEX. PENAL CODE ANN. § 28.02(a)(2) (A) and (F) (Vernon Supp. 2008).

13

B. *Analysis*

The State presented evidence showing appellant's intent to cause an individual's death as follows: On the night of the fire, appellant was angry at his ex-girlfriend, Oralia Cavazos, because she told him she had talked to Ruben Gonzalez and that she would ask him to leave so she and appellant could get back together that night. When appellant arrived at Cavazos's home, she told appellant to wait, and when he opened the door, she closed it on him. In response, appellant broke the front window of Cavazos's home. Appellant drove away, and Cavazos "slammed into the back of [appellant's] car with her car." This evidence established a motive for appellant to murder Cavazos. *See Guevara,* 152 S.W.3d at 50 ("Motive is a significant circumstance indicating guilt.") (citing *Harris v. State*, 727 S.W.2d 537, 542 (Tex. Crim. App. 1987)); *see also Reed v. State,* 744 S.W.2d 112, 127 (Tex. Crim. App. 1988) (providing that evidence which merely goes to show motive or opportunity of the accused to commit the crime may be considered in connection with other evidence tending to connect the accused with the crime).

The evidence regarding arson showed that a sample which Shirley collected from inside the Cavazos home contained a naphthenic paraffinic, which can be used as an accelerant. Furthermore, burn patterns on the enclosed garage's floor showed the fire started in that room. Pleasant's dog, Hyco, searched the Cavazos home for trace amounts of ignitable liquids and alerted once on the living room floor and three times in the enclosed garage. Shirley concluded "that the fire originated on the floor" in the converted garage, and "that there was an ignitable liquid that was poured on the floor of that bedroom and then ignited, using some type of open flame." Salazar determined the fire was an arson fire based upon his observations at the scene. The evidence showed that the fire caused Garcia's death based upon the fact that firefighters found his body in the living room and

14

that his autopsy results showed he died from smoke inhalation.

The evidence that connected appellant to the arson fire was that Captain Rogers, while en route to the fire, saw a man wearing "a dark-colored T-shirt" walking away from the fire on Bear Lane towards Old Brownsville Road. He testified this man "seemed to be trying very hard to avoid seeing us or looking at us," which is "very unusual." In appellant's written statement to Lt. Isaacks, appellant said nothing about a fire, but he stated he "was wearing a black t-shirt."

Melde testified that on the night of the fire, he saw a brown Oldsmobile, license plate HMZ-20W, parked at the Del Mar College west campus located on Old Brownsville Road and Airport Road. The car was there between 12:35 a.m. and 1:05 a.m., based on his thirty-minute patrols of the campus. At approximately 2:35 a.m., he saw a heavy set Hispanic male get in the car and drive off. The evidence showed the car was registered to appellant and that appellant was heavy set and is Hispanic. When Lt. Isaacks spoke to appellant the evening following the fire, appellant could not remember what happened during the time period before and after the fire occurred. Appellant stated in his written statement that "I don't remember anything else until I woke up about 3 a.m. . . . ." Lt. Isaacks received descriptions from individuals who saw a subject matching appellant's description with an injury like appellant had leaving the scene of the fire "right after it was reported." When she talked to appellant on the evening following the fire, he had a bleeding laceration to his forehead and a "pretty fresh" laceration to his right forearm. Lt. Isaacks opined that appellant's head injury was not caused when Cavazos hit the back of his car with her car.

Shortly after the fire, blood samples were taken from both the floor and window sill of a rear bedroom in the Cavazos house. Appellant's DNA profile matched the DNA profile

15

from these blood samples. Appellant's palm print was found in the rear bedroom of the Cavazos home. In his written statement to Lt. Isaacks, appellant stated, "She [Cavazos] told me about the house that she had got. She told me where it was. I told her I knew already *but I really didn't*." (emphasis added). Because appellant stated that he did not know until the night of the fire where Cavazos's house was located, the jury could have concluded that his blood and palm print had to be left there the night of the fire. His blood and palm print connect him to the house. *See Hinojosa v. State*, 4 S.W.3d 240, 246 (Tex. Crim. App. 1999) (holding, in factual sufficiency review, shoe prints discovered at the victim's house connect appellant to that location).

Based upon this evidence, a rational jury could find that appellant parked his car at the Del Mar College west campus sometime between 12:35 a.m. and 1:05 a.m., went to the Cavazos home, entered the home through the rear bedroom where he left his blood on the window sill and the floor, set fire to the house, and then went back to his car and drove away at approximately 2:35 a.m.

The contrary evidence showed that: (1) no one saw who started the fire in the Cavazos home; (2) no one identified appellant as the person leaving the scene of the fire; (3) Pete Salazar could not say exactly what caused the fire; (4) neither assistant fire chief John Page nor Captain Lee Rogers identified appellant as the man they saw walking away from the fire's location; (5) Melde did not identify appellant as the man he saw getting into the brown Oldsmobile; (6) in his written statement, appellant mentioned nothing about his involvement in any fire; (7) appellant did not flee; rather, he met with Lt. Isaacks in Robstown and in Corpus Christi; (8) the victim's autopsy showed he had cocaine and marihuana in his body; and (9) no accelerants were found in appellant's car or on his clothes.

16

The jury has the responsibility to fairly resolve conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences from the evidence. *Threadgill v. State*, 146 S.W.3d 654, 663 (Tex. Crim. App. 2004). Considering the totality of the evidence–motive, the DNA evidence, the palm-print evidence, the evidence showing the fire was caused by arson, appellant's failure to account for the time periods before and after the fire, that, based upon when Officer Longoria arrived at the fire, the fire was reported at least by 1:58 a.m., the fact that appellant's car was parked at Old Brownsville Road and Airport Road between approximately 12:35 a.m. and 2:35 a.m. on the night of the fire, that a heavyset Hispanic man drove away in this car, that appellant is a heavyset Hispanic man, and that Old Brownsville Road is a road which a person could access when either going to or coming from Green Trail Drive—we hold that, when viewed neutrally, the evidence supporting the conviction is not too weak to support the verdict. *See Laster* at *2. Further, considering the conflicting evidence, the verdict is not so against the great weight and preponderance of the evidence that it is manifestly unjust. *See Laster* at *2.

We therefore conclude that the evidence is factually sufficient to support the conviction for capital murder. The fact that a different person than Cavazos died as a result of appellant's conduct is immaterial to whether appellant is criminally responsible for Garcia's death. *See* TEX. PENAL CODE ANN. § 6.04(b) (Vernon 2003).[6]

---

[6]Section 6.04(b) of the penal code provides: "A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that: (1) a different offense was committed; or (2) a different person or property was injured, harmed, or otherwise affected." TEX. PENAL CODE ANN. § 6.04(b) (Vernon 2003).

17

## III. Conclusion

We overrule the sole issue for review and affirm the trial court's judgment.


ROSE VELA
Justice


Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this 26th day of March, 2009.