Ernest Lee HARRIS, a/k/a Justine Delene Lebatti, Appellant,

v.

The STATE of Texas, Appellee.

No. 996–84.

Court of Criminal Appeals of Texas.

March 11, 1987.

J. Ronald Vercher, Houston, David B. Ziegler, Bellaire, for appellant.

John B. Holmes, Jr., Dist. Atty. and Calvin Hartmann and Karen Zellars, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

W.C. DAVIS, Judge.

A jury convicted appellant of murder and assessed punishment at imprisonment for life and a fine of $10,000. The Court of Appeals for the Fourteenth Supreme Judicial District affirmed the conviction. *Harris v. State*, 681 S.W.2d 726 (Tex.App.—Houston [14th Dist.] 1984). We granted appellant's petition for discretionary review to consider his contentions that the Court of Appeals erred in considering hearsay evidence when determining that the evidence was sufficient to support the jury's verdict; and that the Court of Appeals erred in concluding that the evidence was sufficient to prove beyond a reasonable doubt that appellant caused the death of the victim.

The State's case rested entirely on circumstantial evidence. The Court of Appeals' rendition of the lengthy testimony is accurate and we adopt it in our opinion.

"The victim, Lorelei Marie Wickers, a/k/a Delta S. Lee, a teenage runaway from New York, travelled to Texas with two other girls in January 1981. Shortly thereafter, Lorelei met Appellant, a self-admitted pimp, and began working for him as one of his prostitutes. Apparently his only other 'girls' were his common-law wife, Sharon (Sheri, Sherri, Cheri) Rada, and Frankie Pesina.

"[Lester Thurman, who had been a 'pretty good' friend of appellant's in early 1981, testified that appellant told him he was a pimp. Thurman met Rada and Lorelei and knew they were prostitutes who worked for appellant. Thurman testified that in February, 1981, appellant told him that Lorelei wasn't working out, that he was probably going to get rid of her.][1]

"In the spring of 1981, Rada and Lorelei worked in a massage parlor in Austin, Texas. In May or June 1981, they moved back to Houston and, along with Pesina, began working as hostesses and dancers at the Stone Fox Nude Dance Club. The club was near Apellant's apartment at 501 Greens Road, # 1406. George Banaduc, the owner and manager of the Stone Fox, was interviewed by Ron Adelberg, a special agent with the Houston Division of the Federal Bureau of Investigation (F.B.I), who testified at trial. Banaduc told Adelberg that the girls also worked as prostitutes for Appellant and that Appellant always drove them to and from work. He also told Adelberg that the last time he saw Lorelei alive was around 8:00 or 9:00 P.M. on June 3, 1981, when she, Rada and Pesina finished their shift.

"On June 5, 1981, at approximately 10:00 A.M., Johnny Williams discovered Lorelei's

---

1. We insert this additional paragraph to the Court of Appeals' rendition of testimony.

nude body while fishing in an alligator-infested canal in the Sabine National Wildlife Refuge in Cameron Parish, Louisiana. One ten kilo weight was tied around her neck and one was tied around her ankles. The weights were attached with cotton rope and anchored both ends of her body; however her buttocks stuck out of the water, enabling Williams to see her. He pulled her body partially into the shore with his fishing rod, secured it and notified the authorities who later recovered it.

"Lehrue Stevens, M.D., performed the autopsy on Lorelei. He found large and multiple bruises all over her body; marks on her chest, breast and face that he believed were caused by cigarette burns; a fractured jaw; a hemorrhage on her liver surface; a tear in the capsule of her liver; a gunshot exit wound to her skull with the entry wound in the palate area of her mouth; and bruises and powder burns on her lips, probably caused by the recoil of a gun placed and fired in her mouth. Dr. Lehrue concluded that all of the injuries were pre-mortem, that Lorelei appeared to have been beaten and that she died as a result of massive cerebral damage caused by the gunshot. Dr. Lehrue also noticed post-mortem wounds. One such wound consisted of 'pressure marks' on the left side of her body which he opined were made by either a cloth or rubber floor mat. Additionally, he noted that her blood had settled in the left side of her body. He estimated Lorelei had been dead for approximately thirty to thirty-five hours before her body was discovered. (She had last been seen alive approximately thirty-seven hours before the discovery of her body).

"Other indentions on the body later were observed by James Supan, a special agent with the F.B.I. in Lake Charles, Louisiana. Supan discovered very small checkered patterns which could have been made by a matted material such as carpet; a handprint and fingerprints on her left arm, which later were found to be from the tightening grip of her own right hand; and what appeared to be zipper marks on her buttocks.

"John C. Saunders, a fingerprint specialist for the F.B.I., saw the body on June 20, 1981. He took fingerprints of the victim. Later, they were matched with latent prints on Delta S. Lee's massage license application in Austin. Delta was determined to be Lorelei Marie Wickers.

"Appellant, Rada and Pesina travelled to Lake Charles, Louisiana and met Tommy Geyen and Warren Landry in front of a bar on June 4, 1981. They were in a Thunderbird which Appellant had rented in Austin. Appellant said they were just passing through and needed some place to stop and rest. Landry offered his house. At about 5:00 P.M. that day, Geyen and Landry drove one car and Appellant, Rada and Pesina drove the Thunderbird down Highway 14 towards the Gulf of Mexico. Landry later decided to return to his house to prepare dinner, and Geyen got in the Thunderbird.

"Appellant, Geyen, Rada and Pesina eventually arrived at the Sabine National Wildlife Refuge where Appellant found a ramp near the canal and backed up on it. Appellant told Geyen to go to another area to start a fire. He left for about twenty minutes and attempted to start a fire. During this time, Appellant, Rada and Pesina were alone by the Thunderbird. Geyen returned when Appellant asked him to help inflate a raft. He told Geyen that the girls wanted to go skinny dipping and would float out on the raft. While Geyen was assisting Appellant, he saw weights and cotton rope in the car trunk. Appellant said that the weights and rope were to keep the raft from floating too far away from the shore. After the raft was inflated, Appellant instructed Geyen to take the car to a store to buy gas and beer. Pesina accompanied him on the trip which took approximately thirty to forty-five minutes. On the return trip, Geyen lost control of the car and ran into the canal near the home of John Walther, the warden of the wildlife refuge. At Geyen's request, Walther called a wrecker to pull the car out of the canal and tow it to a storage facility. Walther also called the Cameron Sheriff Department and Deputy Archie L. Bourns arrived at the scene of the accident.

"While waiting for the wrecker, Geyen and Pesina directed Walther to the place where they had left Appellant and Rada. The distance from the scene of the accident to the ramp where Appellant and Rada had remained was approximately one to one and one-half miles. Walther testified that he did not see anyone at the ramp. Geyen began gesturing and Appellant and Rada emerged from the weeds where they had been hidden from view. Walther observed that Appellant was well-dressed and carried a gear or garment bag with a long zipper.

"[After returning to Walther's headquarters, Walther opened the bag appellant had brought with him. He was checking to see if there were any firearms or dead game. Walther opened the bag and felt around the inside of it. He felt something pliable and folded, similar to an inner-tube.][2]

"Bourns issued two citations, one to Appellant for allowing an unlicensed driver to drive his car and one to Geyen for driving without a license. Bourns also took the names of all four people involved. None of them offered any identification to Bourns but did provide correct names and addresses. Later, a diver found Pesina's purse, which contained her identification, near the location where the body was found.

"Appellant called Landry to pick the four of them up and drive them back to Lake Charles. After Landry took Geyen home, they returned to his house and spent the night. The next day Appellant paid Landry to drive them back to Houston. The last time Landry saw them was in Houston after he had taken them to a U–Haul Truck Rental in north Houston near Appellant's Greens Road apartment.

"On the morning of June 5, the sheriff's department dispatcher informed Bourns that a body had been found in a canal in the refuge. He did not at that time connect the body with the citations he had issued. Walther made the connection, though, when he learned from the sheriff's office that the body was found at the location Geyen had led him to pick up Appel-

lant and Rada. He passed this information on to the sheriff's department and the search for Appellant, Rada and Pesina began.

"Appellant's car was searched while it was in the salvage yard by Roger Rubrecht and James Supan, both of the F.B.I. They found Houston telephone books, a work order for the installation of a telephone for Delta Lee, carpet, a trunk liner, a utility knife package and various other items. The rope, weights and raft, which Geyen previously observed in the trunk, were no longer there. However, at that point in the investigation, the agents were unaware that those items had been seen in and removed from the car. They focused their attention on the utility knife package.

"Supan determined that the knife came from White's Auto Store in Lake Charles. After talking to the manager of the store, he learned that a raft, rope and weights also had been purchased. The receipt showed that the sale occurred on June 4, 1981, one day before Lorelei's body was found.

"Supan also talked to the two clerks who waited on the customer who made the purchase. They both described him as a well-dressed black man who wore a lot of flashy jewelry. They did not identify Appellant at trial. Further discussion with the clerks revealed that the purchaser had asked for more weights but was told that the store did not have any more. The clerks identified the raft box and pictures of the weights and ropes that were found at the scene of the crime as similar to those they had sold. Geyen also identified those items as similar to those he had seen in Appellant's trunk. Allan T. Robillard, a special agent with the F.B.I., compared rope samples provided by White's Auto Store with the rope used to tie the weights to Lorelei an determined that they had fairly unique composition and could have originated from the same manufacturer.

"The Houston Division of the F.B.I. received the evidence from Appellant's car and contacted the Houston Police Depart-

**2.** We insert this additional paragraph to the Court of Appeals' rendition of testimony.

ment (H.P.D.) These items led to Appellant's empty apartment at 501 Greens Road, # 1406. While at Appellant's apartment complex, Royce Logan and Ron Adelberg, both of whom were special agents with the F.B.I., interviewed several people. While speaking to Logan, who testified at trial, Appellant's next door neighbor described four individuals. The descriptions fit those of Appellant, Rada, Pesina and Lorelei. She also told Logan that a black woman, a white woman and two black men moved the belongings out of the apartment on the evening of either June 5 or 6, 1981. The U–Haul truck rented by Appellant on June 6, which apparently was used to move the belongings, was discovered abandoned in a vacant lot in Las Cruces, New Mexico on June 16.

"The investigation of the apartment reveals that a piece of carpet and padding had been cut out of the hallway and Lorelei's palm print was found on the left side of the lavatory in the bathroom. Officer Flowers cut samples of the carpet to match with the missing piece of carpet in the event it was found.

"The matching piece of carpet was found approximately seven weeks later, on July 24, 1981, by Theos Duhon, the Chief Investigator for the Cameron Parish Sheriff Department in Louisiana. It was found in a ditch on a dead end road off of Highway 14, approximately one to two miles south of Lake Charles. Appellant and his party travelled via Highway 14 from Lake Charles to the site where Lorelei's body was found.

"The H.P.D. Crime Lab determined that the stains on the carpet were composed of human blood. James Bolding, who ran the tests, could not type the blood because of the effect the weather and exposure had on both it and the carpet. Nevertheless, Robert H. Werkentin, a Chemist and Toxicologist with H.P.D., concluded that the samples of carpet taken from Appellant's apartment matched the piece of carpet which was found in Louisiana.

"F.B.I. agent Leo Gonzales saw Rada in El Paso on July 3 and arrested her. She led Gonzales and other agents to Appellant's house where he was arrested. They were returned to Houston for trial. Pesina has never been apprehended."

■ Appellant contends that the Court of Appeals should not have considered the hearsay testimony of F.B.I. agent Ron Adelberg, in which he testified that George Banaduc, owner of the Stone Fox, told him that the girls worked as prostitutes for appellant, that appellant always drove them to and from work, and that Banaduc had last seen the deceased about 8:00 or 9:00 p.m. on June 3, 1981, when she, Rada, and Pesina finished their shift.[3]

Appellant also complains of hearsay testimony from F.B.I. agent Royce Logan in which he related what a neighbor said regarding people moving out of appellant's apartment on June 5th or 6th. Appellant did not object to most of this evidence.

In our recent opinion in *Chambers v. State*, 711 S.W.2d 240 (Tex.Cr.App.—1986), we held that unobjected to hearsay has probative value and can be used in determining the sufficiency of the evidence to sustain a conviction. Appellant did not object to the hearsay testimony. No error is presented in its use in determining the sufficiency of the evidence. Appellant's first contention is overruled.

We turn now to a review of the sufficiency of the evidence to determine if a rational trier of fact could have found appellant guilty of murder beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1974). We utilize the "outstanding reasonable hypotheses" analysis in reviewing the circumstantial evidence under the above-mentioned standard of review. See *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr.App.1983) (opinion on rehearing).

Appellant admits that the evidence establishes, circumstantially, that he, Rada and

---

3. Contrary to appellant's assertions in his petition, this hearsay testimony does not place appellant in the company of the deceased. It does show when the deceased was last seen alive.

Also, another witness, Lester Thurman, testified that appellant was a pimp and that the deceased worked for him, thus showing appellant's relationship to the deceased.

Pesina disposed of the deceased's body in a canal in the Sabine National Wildlife Refuge on June 4, 1981. He contends no evidence was presented that established he murdered the deceased or that he participated as a party in the murder.

Shortly before the deceased was discovered, appellant was present at the location where the body was found. Evidence was introduced showing that rope and weights were sold on June 4, 1981, at White's Auto Store in Lake Charles, Louisiana, to a man fitting appellant's description; and were similar to those seen by Geyen in appellant's car; and similar to those later found on the body of the deceased. We agree that the fact and time of appellant's presence at the location where the body was found, along with the evidence about the ropes and weights, circumstantially proves that appellant helped dispose of the body.

Appellant was found near the body and immediately thereafter fled to El Paso. Such facts are certainly significant as part of the overall picture of the crime and appellant's involvement in it.

Further, as the State argues, the piece of bloodied carpet taken from appellant's apartment and found in Louisiana on the road near the route appellant took to dispose of the body links him to the deceased. The inference can at least be drawn that the deceased was killed in appellant's apartment.

"A conviction based on circumstantial evidence must exclude every other reasonable hypothesis except the guilt of the accused." *Carlsen*, 654 S.W.2d at 447. As always, the evidence must be viewed in a light most favorable to the verdict. Appellant argues that on this state of the evidence Rada or Pesina could have murdered the deceased and appellant "only" have helped dispose of the body. Appellant overlooks a significant fact which links him to the murder and eliminates the others, namely, motive. Appellant, as her pimp, had a great measure of control over the deceased. Lester Thurman, a friend of appellant's, testified that appellant told him in February, 1981, that the deceased was not working out and that he was probably going to get rid of her. A few months later, the deceased was murdered. No evidence was presented that any other person had any motive to kill the deceased.

Viewing the evidence in a light most favorable to the verdict, this combination of appellant's degree of control over the deceased in his position as her pimp, his motive to kill the deceased, his disposal of the body, the strong likelihood that the blood on appellant's carpet was that of the deceased; and appellant's flight, together are sufficient to sustain his conviction by excluding "every other reasonable hypothesis except the guilt of [appellant]."

The judgment of the Court of Appeals sustaining the conviction is affirmed.

CLINTON and TEAGUE, JJ., dissent.