IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-78,989-01






EX PARTE STEVEN MARK WEINSTEIN, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


IN CAUSE NO. 1167730-A IN THE 339TH DISTRICT COURT


OF HARRIS COUNTY






 Cochran, J., delivered the opinion of the Court in which Meyers, Womack,
Johnson, Hervey and Alcala, JJ., joined. Keller, P.J. filed a concurring
opinion in which Price, J., joined. Keasler, J., concurred.



O P I N I O N



 Applicant was convicted of murdering Jerry Glaspie. He filed a post-conviction
application for a writ of habeas corpus, alleging that he was denied due process because (1)
the State failed to disclose that its key witness, Nathan Adams, had hallucinations and
delusions, and (2) the State presented false testimony when Mr. Adams lied about not having
hallucinations and delusions. The habeas judge initially filed findings of fact and
conclusions of law recommending that we deny relief, but we remanded the case and asked
her to determine (1) whether Nathan Adam's testimony was false, and, if so, (2) whether
applicant had shown a reasonable likelihood that the false testimony affected the judgment
of the jury. (1) In revised findings, the judge found that the State unknowingly presented false
testimony when Nathan Adams testified that he did not suffer from auditory or visual
hallucinations. The judge also found that Mr. Adams was a key witness in establishing
applicant's intent to murder. She concluded that there was a reasonable likelihood that the
outcome of the trial would have been different had Mr. Adams admitted to having
hallucinations. 

 We adopt the habeas judge's factual findings that Adams's testimony about his lack
of delusions was false, but we conclude that applicant has failed to prove that Adams's false
testimony was "material," i.e., reasonably likely to have affected the jury's verdict.

I.


 The evidence at trial showed that, in mid-2006, applicant and Jerry Glaspie drove
from Houston to Dallas planning to use applicant's $14,000 to buy methamphetamine. The
drug deal did not go as planned. Although Jerry instructed applicant to bring cash, applicant
tried to buy the meth with a $14,000 cashier's check. "[T]he banks were closed because it
was the weekend and so there was no place to cash the check." Unwilling to wait for the
banks to open, applicant left Jerry in Dallas with his check, expecting him to return to
Houston with either meth or money.

 Jerry remained in Dallas, so applicant called him "four or five times a day," but Jerry
"stopped answering the phone." Then applicant started calling Jerry's friends in Houston.
Around November, applicant contacted Jerry's friends on Manhunt, (2) explaining how Jerry
ripped him off and looking for ways to find him. Applicant "was very upset and angry." He
tried to get a mutual friend to call Jerry and tell him that someone in Houston wanted to make
a major methamphetamine buy. Applicant planned to "surprise" Jerry when he appeared and
demand his money back. When asked what he would do if Jerry didn't have his money,
applicant said, "Oh, well, we'll just scare him."

 Applicant's plans grew more violent. At one point, he suggested driving to Dallas and
"tak[ing] him for a ride somewhere." If Jerry didn't have his money, applicant said that
"maybe we can hurt him. We can do something, just do stuff just to scare him, just to get
him to, you know, cough up the money." In another plot, applicant asked his interior
decorator to help bring Jerry back "with or without [his] consent" by "giving him some drug
or maybe using a taser gun." Applicant also talked about using restraints: "[H]e was [going]
to have to tie him up . . . and then put him in the car and bring him to Houston."

 Jerry eventually returned to Houston without the drugs or applicant's $14,000.
Although he was warned to stay away from applicant, Jerry told his friends that he had
"made arrangements to pay him off in installments," so "[d]on't worry about it."

 On the morning of January 29, 2007, Jerry borrowed his roommate's 4-Runner to visit
some people, including applicant. Jerry never returned. Worried about Jerry's
disappearance, his roommate filed a missing persons report. A few weeks later, police found
the 4-Runner in a church parking lot. Although Jerry's friends feared that he was at
applicant's house, no one called the police because they didn't want cops "poking around"
in their drug business.

 Near the end of February, residents in applicant's townhouse complex noticed an odor
coming from applicant's garage. It was so strong that the mailman refused to deliver the
mail. When his neighbors repeatedly asked about the smell, applicant said that his ex-roommate had hidden food all over the house, but he was trying to clean up all the rotting
food.

 On March 8th, HPD Officer Ladewig was dispatched to applicant's house to check
out the foul odor coming from the garage. She noticed "this awful, horrible smell" and "a
big swarm of flies" coming in and out of applicant's garage. Although she recognized the
smell of a dead body, she was not "100 percent sure" that it was anything more than a dead
animal, so she did not try to contact applicant. Two days later, she was again dispatched to
applicant's home. Convinced that she was smelling a dead body, she asked her supervisor
to join her, and together they knocked on applicant's door and used their loudspeaker, but
applicant did not respond. Although they wanted to make a forced entry, the D.A.'s Office
told them that they could not enter without a search warrant. 

 At 5:00 a.m. on March 22nd, Officer Ladewig was on patrol near applicant's house.
Still convinced that the odor coming from applicant's garage was from a dead body, she
drove her partner to the house to get his opinion. When they arrived, applicant was standing
in his front yard. He told the officers that his ex-roommate "had left rotting meat and trash
all over" the house and garage. While telling his story, applicant "was stuttering" and
"appeared very upset," and "nervous." When Officer Ladewig asked to see inside the
garage, applicant refused because "he was too tired."

 The next afternoon, a different officer was called to follow up on another odor
complaint at applicant's house. He "immediately identified that smell as that of a dead
body." He also smelled "the strong odor of a cleaning agent, like bleach," indicating that
somebody "was trying to clean up after what they did." That officer opened applicant's
garbage can and saw several empty bottles of bleach and other cleaning fluids. He couldn't
contact applicant, but finally officers called for a cadaver dog who "alert[ed]" at applicant's
garage, indicating that there were human remains in the garage. After obtaining a search
warrant, the officers cut through applicant's gate and entered his unlocked house. 

 They discovered applicant lying on a bed upstairs. He "appeared to be shaking, like
he was having a seizure." A police scanner was on the bed next to him. He was taken away
while officers entered the garage and found applicant's car. As an officer went to the trunk
of the car, he saw a bent coat hanger securing the trunk lid shut. He opened the trunk and
found a naked, "badly decomposed," body. An engine hoist was nearby. When they
searched the rest of the house, the officers found an empty oil drum in the kitchen; two
semiautomatic guns near the headboard of applicant's bed; a respirator on the bedroom floor;
and baking soda, cleaning supplies, bug killers, and deodorizers near the entrance to the
garage. 

 Dental and fingerprint evidence confirmed that the body was that of Jerry Glaspie.
Jerry had no clothes on. His wrists and legs were bound together with metal shackles, rope,
chains, and wire. There were "loops of duct tape" around his lower neck that had "probably
slipped off from his lower face." The Medical Examiner (M.E.) determined that Jerry's
death was a homicide, although he could not say with 100% certainty that Jerry did not die
of natural causes. The bones in Jerry's neck had begun to disarticulate, (3) but the M.E. could
not determine if this was caused by strangulation or natural decomposition. While the exact
cause of death could not be determined, the M.E. said that Jerry's death could have been
caused either by strangulation or by asphyxiation from the duct tape.

 Nathan Adams testified that he met applicant in a tank for jail detainees with a
medical illness. Applicant began talking about his case and that jogged Adams's memory
about a television story he had seen reporting that a dead body had been found in a car trunk
after the neighbors had complained about the smell. Adams testified that he did not read any
additional news coverage, nor had he obtained any information about the crime from another
source. Adams testified that applicant told him that Jerry stole $14,000 from him when he
went to Dallas to buy a "car." (4) Applicant told Adams conflicting stories about how Jerry
died, (5) but his second story was "that he had strangled the gentleman and had placed him in
the trunk." Adams testified that applicant demonstrated "on [him] . . . the way he did it:"

 [H]e wrapped a towel a certain way and he asked me to stand up, which I did,
and he came behind me and put the towel in a certain way around my neck and
immediately when he pulled it, it was extremely painful. And I knew that if
that was applied to anybody that they would be in serious trouble immediately. 


Adams explained that applicant was a massage therapist and claimed to have "specialized
knowledge of pressure points, pressure points in the body whether it was . . . to help
somebody or to hurt somebody." Applicant told Adams that he put Jerry's body in the trunk
of his car but the smell became horrible, so he bought dry ice and sprayed insecticides to
keep the smell down. He was scared because the smell was so bad that he "stayed in his
house and never left his house again until the police came."

 Adams testified that applicant explained why he didn't move the body. "He had a
problem because he couldn't get the trunk open . . . I guess the body had swelled so much
that he could no longer open the trunk. . . . [S]o he went to a . . . store, to buy an engine hoist
to try and pry it open." Applicant went into detail about the engine hoist, explaining how he
had to go to the store multiple times because it was missing instructions and necessary parts.

 On cross-examination, the defense extensively impeached Adams's credibility. He
had been in-and-out of jail since the mid 1990s. (6) In addition, Adams admitted that he was
testifying in exchange for a reduced charge from assault on peace officer, a third-degree
felony, to simple assault with credit for time served. In fact, it was Adams who initially
contacted the District Attorney, writing several letters offering to testify against applicant in
exchange for a deal. He also admitted to having seen the indictment-one that charged
applicant with "suffocating" Jerry Glaspie-while in jail. Adams admitted that he was again
in custody because he failed to appear to testify and was brought to the courtroom in
handcuffs.

 Furthermore, Adams admitted that he suffered from bipolar disorder, for which he
takes Depakote and Seroquel. But when he was asked whether his mental illness "has ever
caused you to have any type of audi[tory] or visual hallucinations," Adams responded: "Not
at all. No, sir, not at all." And when asked if he ever experiences false memories, Mr. Adams
responded in the negative. Finally, when asked if his bipolar disorder only affected his
mood, Mr. Adams responded: "Yes, sir, it's just - it's just mood swings is what it is."

 In closing arguments, the defense argued that applicant did not intend to kill Jerry.
Counsel claimed that the State failed to prove what happened on the day Jerry died because
the Medical Examiner could not completely rule out a natural cause of death. Thus, it was
possible that applicant put Jerry in the trunk just to scare him, without any intent to kill him. (7) 
The defense also attacked Adams's testimony, arguing that Adams was the only witness
supporting the indictment's theory that Jerry was strangled, but that Adams was not a
credible witness because he had an extensive criminal record and had every reason to lie.

 The State's closing focused on applicant's motive for killing Jerry and the comments
he made to his friends while Jerry was still in Dallas. The prosecutor tallied up the evidence
showing that Jerry was tied up, alive and struggling. And, the prosecutor argued, it did not
matter exactly how Jerry died: "Was he standing? Was he sitting? I don't know and I don't
have to prove that to you. Because the bottom line is the evidence is consistent with
everything Nathan Adams told you." The prosecutor then turned to Adams's testimony,
admitting that Adams was not "altruistic" and that he had "an agenda" in testifying. But "he
knew things that there's only one way he could know about." The prosecutor pointed out that

 [t]here wasn't anything in the news about 14 grand and a death. It was a body
found in the trunk. You didn't hear any testimony that there was ever anything
released about how the body was killed. There was nothing. But here comes
Mr. Adams and suddenly he knows things that there's no way else he could
know unless he got it from the horse's mouth.

 

He pointed to additional information that Adams could have known only from applicant: He
knew about the use of dry ice and insecticide to cover the smell of the body and he knew
about the engine hoist in applicant's garage. The prosecutor argued that Adams
demonstrated his credibility: "He told you everything [applicant] had told him. He didn't
embellish. He didn't say this was over drugs. . . . If he was making up his testimony, don't
you think he would have fitted it a little bit better?"

 The jury convicted applicant of murder and sentenced him to thirty years'
imprisonment and a $10,000 fine. Applicant challenged the sufficiency of the evidence on
appeal, but the Fourteenth Court of Appeals affirmed his conviction. (8) 

 After we remanded applicant's habeas application to the convicting court, the habeas
judge (9) made "revised" findings of fact and conclusions of law. She found that Adams
testified falsely in "denying that he had any audi[tory] or visual hallucinations and did not
remember things that didn't really happen." She listed numerous reports that said Adams
suffered from delusions and hallucinations. (10) Although the judge found that neither the State
nor the defense were aware that Adams's testimony was false, she found that "[t]he State
created the false impression that Adams was bipolar but never had any type of
hallucinations."

 On the question of materiality, the trial judge concluded that "Adams was the key
prosecution witness, as he was the only person who testified that applicant admitted causing
Glaspie's death. The State used Adams's testimony to establish that applicant intentionally
killed Glaspie." (11) While noting that defense counsel "elicited on cross-examination that
Adams received psychiatric care and medication in jail," the judge concluded that "[t]he
impeachment information contained in Adams's medical records was more important than
other 'impeachment' evidence presented at trial." She recommended granting relief because
"[t]here is a reasonable probability that the outcome of the trial would have been different
had applicant impeached Adams's false testimony that he did not have hallucinations." 

II.


A. Standard of Review

 "On post-conviction review of habeas corpus applications, the convicting court is the
'original factfinder,' and this Court is the ultimate factfinder." (12) Thus we generally defer to
the convicting court's findings of fact that are supported by the record. (13) We also afford that
same level of deference to a habeas judge's ruling on mixed questions of law and fact, if the
resolution of those ultimate questions turns on an evaluation of credibility and demeanor. (14) 
However, "[w]hen our independent review of the record reveals that the trial judge's findings
and conclusions are not supported by the record, we may exercise our authority to make
contrary or alternative findings and conclusions." (15) And we review de novo "mixed
questions of law and fact" that do not depend upon credibility and demeanor. (16) 

 We review factual findings concerning whether a witness's testimony is perjurious
or false under a deferential standard, but we review the ultimate legal conclusion of whether
such testimony was "material" de novo. (17)

B. Habeas review: The issue in false-testimony claims is "materiality" not "harm."

 Generally, our review of a habeas corpus claim involves a two-pronged inquiry. First,
we decide if the applicant has established a cognizable constitutional violation. (18) Second,
if a constitutional violation is shown, we determine whether the applicant was harmed by the
error. (19) An applicant demonstrates such harm with proof "by a preponderance of the
evidence that the error contributed to his conviction or punishment." (20)

 However, habeas claims challenging the use of false testimony are reviewed under
a slightly different analysis. The State's use of material false testimony violates a
defendant's due-process rights under the Fifth and Fourteenth Amendments to the United
States Constitution. (21) Therefore, in any habeas claim alleging the use of material false
testimony, this Court must determine (1) whether the testimony was, in fact, false, and, if so,
(2) whether the testimony was material. (22) 

 The second prong in a false-testimony claim is materiality, not harm. Only the use
of material false testimony amounts to a due-process violation. And false testimony is 
material only if there is a "reasonable likelihood" that it affected the judgment of the jury. (23)
Thus, an applicant who proves, by a preponderance of the evidence, a due-process violation
stemming from a use of material false testimony necessarily proves harm because a false
statement is material only if there is a reasonable likelihood that the false testimony affected
the judgment of the jury. (24) The applicant must still prove his habeas-corpus claim by a
preponderance of the evidence, but in doing so, he must prove that the false testimony was
material and thus it was reasonably likely to influence the judgment of the jury.

C. Is the testimony false? 

 Determining whether testimony is false is distinct from the materiality inquiry. (25) This
Court has consistently held that testimony "need not be perjured to constitute a due process
violation; rather, 'it is sufficient that the testimony was 'false.'" (26) This due-process claim
is "not aimed at preventing the crime of perjury-which is punishable in its own right-but [is]
designed to ensure that the defendant is convicted and sentenced on truthful testimony." (27) 
Neither a witness's nor the State's good or bad faith is relevant to a "false-testimony due-process error analysis." (28) The proper question in a false-testimony claim is whether the
particular testimony, taken as a whole, "gives the jury a false impression." (29) 

III.


A. Were Adams's statements denying any auditory or visual hallucinations false?

 The habeas judge's finding that one portion of Adams's testimony was false is
supported by the record. (30) At trial, the State asked Adams if his mental illness "has ever
caused [him] to have any type of audial [sic] or visual hallucinations." Adams responded:
"Not at all. No, sir, not at all." (31) This testimony was flatly incorrect. (32) Evidence that Adam's
suffered from auditory hallucinations includes:


 On July 28, 2004, Adams reported to MHMRA that "voices . . . tell him to hurt
himself" and that he could not sleep because "the voices keep him awake."

 While at TDCJ, Adams reported "voices telling me to hurt other people and
thinking people were out to kill me."

 "While confined at HCJ on October 16, 2007, Adams reported that he 'was
trying to kill himself and having auditory hallucinations.'"

 In 2007, Adams reported to MHMRA that he was "hearing his father's voice."


 


 In 2008, just three months before sending his first letter offering to testify
against applicant, Adams again reported hearing "voices inside [his] head." 


 


 On December 14, 2008, just two days after testifying that he did not suffer
from auditory or visual hallucinations, Adams told a mental-health clinic nurse
that "he had a history of auditory hallucinations and bipolar disorder with
psychotic features."



It is clear that this portion of Adams's testimony was false; not only did he suffer from
auditory hallucinations, but he suffered from these hallucinations at a critical moment- while
sharing a cell with applicant.


B. Was Adams's false testimony denying auditory hallucinations material?

 Although one portion of Adams's testimony was clearly false, the record does not
support the legal conclusion that this false denial of hallucinations was material to the jury's
verdict. While Adams's false denial prevented the defense from impeaching his ability to
accurately perceive and relate events because of hallucinations, we do not agree with the
habeas judge that this potential impeachment evidence "was more important than other
'impeachment' evidence presented at trial." The defense had already developed a plethora
of impeachment evidence, including,


 Adams was on medication for a bipolar disorder.


 


 Adams had been arrested and convicted for multiple crimes, including
burglary, evading arrest, theft of a firearm, possession of crack cocaine, and
forgery. He was a professional crook.


 


 Adams had a strong motive to testify against applicant: his third-degree felony
charge was reduced to a misdemeanor, and he was released for time served.


 


 Adams read the indictment against applicant and knew that the indictment
alleged "suffocating" the complainant, as one cause of death.


 


 Adams sent multiple letters to the district attorney, asking to testify against
applicant in exchange for a deal. 


 


 Adams failed to appear to testify against applicant. He was taken into custody
and brought into the courtroom handcuffed. 



In sum, the defense had ample ammunition at trial to argue that Adams was a thoroughly
discredited and dishonest witness who should not be believed on any topic. That is precisely
what the defense did argue.

 Further, the State corroborated many of the facts to which Adams testified, severely
limiting any impeachment value the hallucination evidence could have had. Adams testified
that applicant had purchased an engine hoist and attempted to use pesticides to cover the
smell. The State introduced evidence showing the existence of the engine hoist, pesticides,
and deodorizers. Adams also knew that applicant's victim had stolen exactly $14,000 while
purchasing a "car" in Dallas. The State presented multiple witnesses who testified that Jerry
had stolen that exact amount of money from applicant and that purchasing a car is slang for
buying meth. It is unlikely that any jury would believe that Adams received this accurate and
corroborated information from some auditory hallucination. 

 And Adams's long history of auditory hallucinations were "persecution"
hallucinations. All of them revolved around voices telling him to hurt himself or other
people. They were not "descriptive" hallucinations in which voices relayed specific
information to him. Here, Adams never testified that applicant was trying to hurt him or that
he was trying to hurt applicant. Indeed, Adams's testimony was of the Sgt. Friday "Just the
facts, ma'am" variety, and he never expressed any negative emotions or feelings toward
applicant. As the prosecutor noted in his closing argument, Adams "didn't embellish. He
didn't say this was over drugs. . . . If he was making up his testimony don't you think he
would have fitted it a little bit better?" 

 Finally, applicant's conviction was supported by an abundance of evidence unrelated
to Adams's testimony. That evidence included, 


 Testimony by several of applicant's friends that Jerry stole $14,000 from
applicant; 


 


 Testimony that applicant was incredibly angry at Jerry and reached out to
mutual friends to locate him;


 


 Testimony that applicant formulated several schemes to "scare" Jerry,
including a scheme to drug him, tie him up, and forcibly bring him to Houston;


 


 Testimony that Jerry was going to see applicant on the day he disappeared; 


 


 The fact that Jerry's body was discovered in applicant's car, which was parked
in applicant's garage; 

 The fact that Jerry's arms and legs were bound, that his wrists were bound
with metal shackles, rope, chains, and wire, and that duct tape circled his neck;


 


 The evidence that applicant attempted to cover the smell from Jerry's
decomposing body; 


 


 Testimony that applicant was found next to a police scanner, tuned to the
police's radio frequency;


 


 Applicant's repeated lies to his neighbors and the police, claiming that the
smell from his garage was caused by rotting meat hidden by his roommate;


 


 The Medical Examiner's testimony that Jerry's death was a homicide; and


 


 The Medical Examiner's testimony that disarticulating bones in Jerry's neck
could have been caused by strangulation.


 

 We do not agree that Adams's testimony was necessary to prove intentional murder.
A jury may rely on circumstantial evidence to prove a defendant's guilt. (33) Applicant had a
strong motive to murder Jerry, and "[m]otive is a significant circumstance indicating guilt." (34)
Applicant's intent to commit murder may also be inferred from circumstantial evidence,
including his acts and words, (35) such as his attempts to persuade others to help him kidnap
Jerry to make him pay back the stolen money, the four different types of bindings on Jerry's
wrists, and the use of duct tape over Jerry's mouth that could have caused his asphyxiation. 
In addition, "[a]ttempts to conceal incriminating evidence, inconsistent statements, and
implausible explanations to the police are probative of wrongful conduct and are also
circumstances of guilt." (36) Applicant's attempts to conceal Jerry's body and his implausible
explanations to police are strong evidence of applicant's consciousness of guilt. Jerry was
found in the trunk of applicant's car, which was parked in applicant's garage. Jerry had been
concealed in this trunk for many weeks. Applicant's garage contained deodorizers,
pesticides, and baking soda, demonstrating that he was attempting to conceal the odor. The
evidence showed that applicant stayed in the townhouse the entire time Jerry's body was in
his trunk. When asked about the smell, applicant either did not respond or made up stories
about his roommate leaving rotting meat in the house. This body of evidence, especially
when coupled with applicant's motive to kill Jerry, is sufficient to prove that applicant
intentionally murdered Jerry. 

 Given all of the circumstantial evidence, it is very unlikely that Adams's testimony
was the tipping point. Therefore we conclude that applicant has not proven his habeas-corpus claim by a preponderance of the evidence. He has failed to show that Adams's false
testimony about his auditory hallucinations was "material" such that there is "a reasonable
likelihood" that this false testimony affected the jury's judgment. (37) We therefore deny relief.

Delivered: January 29, 2014

Publish
1. Applicant also claimed that he was denied effective assistance of counsel, but the
habeas judge's initial factual findings and conclusions of law determined that applicant had not
proven that claim. We adopt those findings and summarily deny relief on that claim.
2. Manhunt is a "dating website . . . mainly used for hooking up for sexual encounters . . .
a lot of people that seemed to get on there were also recreational drug users." 
3. "Disarticulation" describes the "separation of two bones at a joint. This may be the
result of an injury or it may be done by the surgeon at operation in the course of amputation; for
example of a limb, finger, or toe." Oxford Concise Medical Dictionary 214 (8th Ed. 2012). 
4. Another witness testified that "automobile" was a code word for crystal meth. 
5. In his first story, applicant told Adams:

 [H]e was asleep and heard a noise downstairs. He went downstairs to find this
other gentleman who owed him the money in handcuffs with another man holding
a pistol against him and then that gentleman gave that guy a shot and he fell
asleep. And then that gentleman gave [applicant] a shot and he fell asleep. . . .
And then within 24 hours he started smelling a smell. 
6. The defense impeached Adams with his prior arrests and convictions, including
convictions for burglary, evading arrest, several thefts, unauthorized use of a motor vehicle, and
possession of crack cocaine.
7. The defense claimed that applicant lacked the requisite intent, arguing:

 [H]e put Jerry in the trunk to scare him, that he took off his clothes to humiliate
him. That's what he told them he wanted to do. He wanted to scare him. He
wanted to humiliate him. . . . Did he intend to kill him? No. Is it possible that he
runs out of oxygen in the trunk? Yes. . . . If he wanted to kill him, he just would
have shot him. 
8. Weinstein v. State, No. 14-08-01149-CR, 2010 WL 2967675 (Tex. App.--Houston
[14th Dist.] July 29, 2010, pet. ref'd) (not designated for publication).
9. The habeas judge was not the same judge who presided over the trial.
10. For example, Mr. Adams made multiple reports to the Harris County Jail, TDCJ,
MHMRA, and the Harris County Sheriff's Office that he was hearing voices in his head. 
11. The habeas judge also found: "When Newman told Judge Caprice Cosper during the
trial that Adams has disappeared, Judge Cosper said, in essence, that if Newman did not find
Adams, the State 'didn't have a case[,]'" and "Newman wrote a blog on the internet on the day
that the trial ended in which he referred to Adams as a 'crack addict who just happened to be my
star witness.'"
12. Ex parte Chavez, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012) (quoting Ex parte Reed,
271 S.W.3d 698, 727 (Tex. Crim. App. 2008)).
13. Id. 
14. Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). 
15. Reed, 271 S.W.3d at 727 ("[W]e will afford no deference to findings and conclusions
that are not supported by the record and will ordinarily defer to those that are"). 
16. Guzman, 955 S.W.2d at 89. 
17. See, e.g., Douglas v. Workman, 560 F.3d 1156, 1172 (10th Cir. 2009) (in addressing
habeas claims involving Brady or false testimony, materiality of evidence is reviewed de novo as
a question of law); United States v. Severns, 559 F.3d 274, 278 (5th Cir. 2009) (applying de novo
review of the denial of a motion for a new trial based on alleged Brady violation, but
"proceed[ing] with deference to the factual findings underlying the district court's decision");
United States v. Joseph, 996 F.2d 36, 39 (3rd Cir. 1993) ("[W]hen a Brady violation is alleged
issues of law and fact usually are presented. In that circumstance, we review the district court's
legal conclusions on a de novo basis and its factual findings under the clearly erroneous
standard."); Moon v. Head, 285 F.3d 1301, 1310-11 (11th Cir. 2002) (reviewing habeas
determination of Brady materiality issue de novo); see also Parker v. State, 89 So.3d 844, 865
(Fla. 2011) (in addressing false-testimony claims, appellate court defers to trial court's factual
findings, but "reviews de novo the application of the law to the facts" in determining
materiality).
18. Ex parte Ramey, 382 S.W.3d 396, 397 (Tex. Crim. App. 2012) ("Habeas corpus is
available only for jurisdictional defects and violations of constitutional or fundamental rights");
Ex parte McCain, 67 S.W.3d 204, 207 (Tex. Crim. App. 2002).
19. Ex parte Fierro, 934 S.W.2d 370, 374-75 (Tex. Crim. App. 1996).
20. Id.; see Ex parte Parrott, 396 S.W.3d 531, 534 (Tex. Crim. App. 2013) ("The general
rule is . . . that an applicant must show harm to obtain habeas relief: '[A] post-conviction habeas
corpus application must allege facts which show both a cognizable irregularity and harm.' An
applicant demonstrates harm with proof '
by a preponderance of the evidence that the error
contributed to his conviction or punishment.'"). This standard differs from the federal habeas
harmless-error standard, which asks whether the constitutional error "had substantial and
injurious effect or influence in determining jury's verdict." Brecht v. Abrahamson, 507 U.S. 619,
637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). The Brecht or
Kotteakos standard is the same one as the Texas standard for non-constitutional error on direct
appeal. See Tex. R App. P. 44.2(b); King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)
(citing Kotteakos and stating that the Rule 44.2(b) harm standard is whether the error in
admitting the evidence "had a substantial and injurious effect or influence in determining the
jury's verdict.").
21. Ex parte Fierro, 934 S.W.2d 370, 372 (Tex. Crim. App. 1996); Ex parte Chabot, 300
S.W.3d 768, 770-71 (Tex. Crim. App. 2009); see also Giglio v. United States, 405 U.S. 150,
153-54 (1972). 
22. See Ex parte Chavez, 371 S.W.3d 200, 207-10 (Tex. Crim. App. 2012).
23. Chavez, 371 S.W.3d at 206-07 ("The present standard for materiality of false testimony
is whether there is a 'reasonable likelihood that the false testimony affected the applicant's'
conviction or sentence."). 
24. In Chavez, we held that, because the use of false testimony was not material, no harm
analysis was necessary. 371 S.W.3d at 210. Although we suggested that "materiality" and
"harm" might be separate inquiries, it is difficult to hypothesize how an applicant could prove
one without proving the other. 
25. See Giglio, 405 U.S. at 154 (explaining that not every finding of the use of false
evidence is incompatible with due process; courts must also determine whether that evidence
was "material" such that "'the false testimony could . . . in any reasonable likelihood have
affected the judgment of the jury'").
26. Ex parte Chavez, 371 S.W.3d at 208 (quoting Ex parte Robbins, 360 S.W.3d 446, 459
(Tex. Crim. App. 2011)); Ex parte Napper, 322 S.W.3d 202, 244 (Tex. Crim. App. 2010) 
(nothing in the record suggested that the witness intentionally provided false testimony or
thought that his testimony was inaccurate).
27. Ex parte Chavez, 371 S.W.3d at 211 (Womack, J., concurring) (internal quotation
marks omitted).
28. Ex parte Chavez, 371 S.W.3d at 208. 
29. Id. (citing Ex parte Ghahremani, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011);
Alcorta v. Texas, 355 U.S. 28, 31 (1957)).
30. "The medical records demonstrate that Adams testified falsely in denying that he had
any audial or visual hallucinations and [that he] did not remember things that didn't really
happen." 
31. Id.
32. One might argue that, because those with a bipolar mental illness do not normally have
hallucinations, Adams might have suffered from another different mental illness, such as
schizophrenia, and it was that mental illness, not the bipolar mental illness, that caused his
hallucinations. This is, however, a very fine point, and the trial judge found, as a factual matter,
that Adams lied. We must defer to that finding because it is supported by the record.
33. Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2005). 
34. Id. at 50 (citing Harris v. State, 727 S.W.2d 537, 542 (Tex. Crim. App. 1987)). 
35. Id. (citing Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995)). 
36. Id.; See also People v. Graham, 191 Cal. App. 2d 521, 539 (Cal. Ct. App. 1961)
("Where a homicide has been committed and the body concealed, it is a legitimate inference that
the person who concealed the body is connected with the crime, either as its direct perpetrator or
as a participant"); State v. Austin, 368 N.E.2d 59, 69 (Ohio Ct. App. 1976) ("the concealment or
destruction of a body is a circumstance permitting not only an inference of guilt as to homicide,
but may also be considered in finding premeditation."); Edmonds v. Commonwealth, 329 S.E.2d
807, 812 (Va. 1985) (circumstantial evidence including the defendant's efforts to conceal the
victim's body was sufficient to prove murder was willful, deliberate, and premeditated).
37. Ex parte Chavez, 371 S.W.3d 200, 207-10 (Tex. Crim. App. 2012).